Martin Goldfield and Bernice Goldfield v. Commissioner.
Goldfield v. Comm'r
Docket Nos. 995-62, 4851-64.
United States Tax Court
T.C. Memo 1967-129; 1967 Tax Ct. Memo LEXIS 131; 26 T.C.M. (CCH) 575; T.C.M. (RIA) 67129; June 13, 1967
*131 Held: (1) Petitioner, Martin Goldfield, realized in 1957 additional long-term capital gain in the amount of $41.98 from the sale in that year of an interest in a partnership; (2) petitioner realized in 1957 and 1959 unreported income of not more than $1,200 in each year from poker playing; and (3) petitioner is entitled in 1959 to additional deductions for ordinary and necessary business expenses of $2,137.49. S. *132 Laurence Shaiman, for the petitioners. Stephen P. Cadden, for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: In these consolidated proceedings respondent determined deficiencies in income tax and 50 percent additions to tax as follows: Calendar
50 Percent
Docket No.
Year
Deficiency
Addition
995-62
1957
$ 5,886.94
$2,943.47
4851-64
1959
10,538.37
5,269.18
Respondent now concedes that he erred in determining the 50 percent additions to tax and that no fraud penalty is to be asserted against petitioners for either the year 1957 or 1959. For the purpose of conforming the pleadings to the proof, in accordance with the provisions of our Rule 17(d), petitioners filed first amended petitions alleging that: (1) Respondent erred in determining that petitioner, Martin Goldfield, realized an additional long-term capital gain in 1957 of $2,854.48 instead of only $41.98 upon the sale in that year of a partnership interest; (2) Respondent erred in determining that petitioner realized additional income in 1957 and 1959 of $10,514.90 and $27,913.95, respectively, computed from an analysis of bank deposits *133 and cash expenditures; and (3) Petitioner, through error, failed to deduct ordinary and necessary business expenses in the amount of $3,137.49 which he incurred during the year 1959 in connection with the operation of businesses owned by him. Several other errors were assigned and adjustments to income made, all of which have been agreed to by the parties and effect will be given to such agreements in recomputations to be made under Rule 50. Findings of Fact The stipulated facts are incorporated herein by reference. Petitioners were married on January 27, 1957, and resided at Huntingdon Valley, Pa., on the dates when the original petitions in these proceedings were filed but, on June 28, 1966, when the first amended petitions were filed, they resided in Philadelphia, Pa. Petitioner Martin Goldfield's legal name is Morris but he has used the name Martin for several years. Either name has been used indiscriminately in the various documentary exhibits received in evidence. During the year 1957 petitioner Bernice Goldfield was employed by the Department of Health, Education, and Welfare. At all times material, petitioner Martin Goldfield, hereinafter sometimes referred to *134 as petitioner, owned interests in various retail meat and grocery businesses. Petitioners filed timely joint Federal income tax returns, using the cash method of accounting, for the calendar years 1957 through 1959 with the district director of internal revenue at Philadelphia, Pa. The amounts of taxable income and the tax liability reported on these returns were as follows: Taxable
Income Tax
Year
Income
Liability
1957
$11,667.97
$2,770.33
1958
3,691.49
880.05
1959
6,111.91
1,444.62
All of these returns were prepared from petitioners' records for petitioners by Morton Tanenbaum, a certified public acountant. Facts as to Issue 1 Sometime in the middle of 1956 petitioner opened a meat concession at the Pennsauken Merchandise Mart, a farmers' market located in Pennsauken, N.J. This business was initially owned by petitioner as a sole proprietorship. By agreement dated September 19, 1956, petitioner sold a one-half interest in this meat concession to one Joseph Burt. The agreement provided that petitioner and Burt were to operate the meat concession as equal partners. Petitioner received from Burt $8,000 for a one-half interest in the equipment *135 and the lease, together with $610.65, representing one-half of the value of the inventory of meat and paper supplies then on hand, or a total of $8,610.65. More than six months later, namely, by agreement dated December 2, 1957, petitioner sold to Burt his one-half interest in the partnership for "the total Purchase Price of" $25,000, $5,000 of which was to be held in escrow pending the negotiation and execution of a new lease by Burt and $20,000 to be paid in cash by Burt to petitioner on or before January 10, 1958. The $20,000 was paid by Burt to petitioner by check dated December 17, 1957. Among other things, the said agreement dated December 2, 1957, provided: 1. GOLDFIELD does hereby assign, transfer and set over, and by these presents has assigned, transferred and set over unto BURT all his right, title and interest in and to the stock, fixtures, good-will, the existing lease or leases, trade-name, and all other assets of the co-partnership heretofore existing between them, unto BURT, subject, however, to all of the liabilities of the said partnership existing at the time of the execution of this Agreement. 2. BURT agrees that he will save GOLDFIELD harmless from any and *136 all debts existing as of the date of the execution of this Agreement. * * *
6. BURT agrees to pay to GOLDFIELD the total Purchase Price of Twenty-five thousand ($25,000.00) Dollars, which sum is to be paid as follows: * * *. Through error, petitioner, in schedule D of the 1957 joint return, reported a total gain of $11,018.75 from the sale to Burt of petitioner's interest in the above partnership, partly ($393.75) as long-term capital gain and partly ($10,625) as gain from the the sale of property other than capital assets as follows: Long-Term Capital Gain
Kind of
Date
Date
Gross Sales
Property
Acquired
Sold
Price
Equipment
Various
12-17-57
$ 9,000.00
Depreciation
Expense
Allowed
Cost
of Sale
Gain
$1,209.37
$9,046.87
$375.00
$ 787.50
Less 50% deduction
for Long-Term
Capital Gain
393.75
Balance reportable
$ 393.75
Property Other Than Capital Assets
Lease and
Good Will
9-18-56
12-17-57
$11,000.00
Depreciation
Expense
Allowed
Cost
of Sale
Gain
$375.00
$10,625.00
In his determination of the deficiency for 1957 respondent made no change in the $10,625 gain petitioner reported from the sale *137 of the lease and good will for a gross sales price of $11,000. Regarding the long-term capital gain of $393.75 reported from the sale of the equipment for $9,000, the respondent determined that the depreciated cost basis of such equipment was $2,128.54 [1] instead of $7,837.50 (cost $9,046.87 less depreciation $1,209.37) as reported by petitioner, and that there was an additional long-term capital gain realized of $2,854.48 computed as follows: Selling price
$9,000.00
Basis
2,128.54
$6,871.46
Less: Expense of sale
375.00
Net Long-Term Capital Gain
6,496.46
Less 50% Long-Term Capital Gain
3,248.23
3,248.23
Amount reported per return
393.75
Additional
$2,854.48
The correct additional long-term gain *138 realized on the sale of the partnership interest was $41.98, computed as follows: Selling price
$25,000.00
Basis
2,128.54
$22,871.46
Less: Expense of sale
750.00
Net Long-Term Capital Gain
22,121.46
Less: 50% Long-Term Capital Gain
11,060.73
Reportable as Taxable Income
11,060.73
Total income reported by petitioners
11,018.75
Additional Taxable Income
$ 41.98
Facts as to Issue 2 From an "Analysis of Bank Deposits and Cash Expenditures for years 1957, 1958, and 1959" (respondent's Exhibit F, incorporated herein by reference) the respondent determined that petitioner received "Additional Other Income" of $10,514.90 in 1957 and $27,913.95 in 1959. A summary of Exhibit F is as follows: Summary of Analysis (Ex. F)
Additions (Debit Items)
1957
1958
1959
Bank Deposits
Broad Street Trust Co.
$13,581.63
$50,991.63
$34,882.40
P.S.F.S.
14,511.77
0
0
2nd Natl. Bank of Phila.
0
1,959.00
413.62
Other banks
2,800.00
26,568.37
21,835.94
Total
$30,893.40
$79,519.00
$57,131.96
Other Additions
Repaid Loan (Globe 12/16/57)
1,500.00
0
0
Purchase of Equipment
0
0
8,000.00
Personal Cash Expenditures
4,000.00
4,000.00
4,000.00
Total Additions
$36,393.40
$83,519.00
$69,131.96
Subtractions (Credit Items)
25,878.50
95,081.65
29,655.36
Balance
$10,514.90
[11,562.65)
$39,476.60
Balance of funds carried over to 1959
0
0
(11,562.65)
Additional Other Income
$10,514.90
$27,913.95
*139 The opening and closing balances, the deposits, checks written, and surcharges made by the bank in the Board Street Trust Company account for the years 1957 through 1959 were as follows: Opening
Checks
Closing
Year
Balance
Deposits
Written
Surcharges
Balance
1957
$ 293.47
$13,581.63
$ 9,301.53
$18.35
$4,555.22
1958
4,555.22
50,991.31 *
55,434.04
18.00
94.49
1959
94.49
34,882.40
34,959.14
17.75
None
The opening and closing balances, the deposits, and withdrawals in the Philadelphia Saving Fund Society account (P.S.F.S.) for the year 1957, were as follows: Opening
Closing
Year
Balance
Deposits
Withdrawals
Balance
1957
None
$14,511.77
$14,425.00
$86.77
The opening and closing balances, deposits, and checks written in the Second National Bank of Philadelphia regular checking account No. XX-028-0 of petitioner Bernice Goldfield for the years 1958 and 1959 were as follows: Opening
Checks
Closing
Year
Balance
Deposits
Written
Balance
1958
$87.67
$2,237.00 *
$2,261.59
$63.08
1959
63.08
413.62
476.70
None
*140 Petitioners' only source of taxable income during the years before us was the profit or gains derived from petitioner's interests in the various retail meat and grocery businesses (hereinafter listed), interest income in 1957 of $123.42 (unreported) and $446.28 ( $96 reported and $350.28 unreported) in 1959, a long-term capital gain in 1959 of $925.36 from the sale of stock (reported), net winnings from poker (hereinafter mentioned) of not more than $1,200 (unreported) in 1957 and 1959, and wages received by Bernice in 1957 from the Department of Health, Education, and Welfare of $3,299.19 (unreported). The respondent made adjustments to the taxable income, previously shown, reported by petitioners in the returns prepared by Tanenbaum for 1957 and 1959 as follows: Adjustments to Income - 1957
Taxable income per return
$11,667.97
Unallowable items and additional
income: (a) Wages of wife
3,299.19
(b) Other income (Issue 2)
10,514.90
(c) Interest income
123.42
(d) Exemption credit
600.00
(e) Long-term capital gain (Issue 1)
2,854.48
Taxable income as corrected
$29,059.96
Adjustments to Income - 1959
Taxable income per return
$ 6,111.91
Additional income and unallowable
deductions: (a) Interest income
12.78
(b) Interest income
337.50
(c) Other income (Issue 2)
27,913.95
(d) Depreciation (Amports)
121.65
(e) Depreciation (Martin's Thrift-
way)
62.50
(f) Rent deduction disallowed
475.00
$35,035.29
Items allowed: (g) Interest deduction
108.40
(h) Standard deduction
120.90
Taxable Income
$34,805.99
*141 All of the above adjustments have been conceded by petitioners except Items (b) and (e) for 1957 and (c) for 1959. Petitioner's interests in the various retail meat and grocery businesses are listed as follows: (a) Meat concession opened in the middle of 1956 in Pennsauken, N.J., and operated as a sole proprietorship until September 19, 1956, and thereafter as a partnership with Burt until December 2, 1957, when he sold his partnership interest to Burt. Taxable income from partnership was reported of $4,049.22 in the 1957 return. Respondent made no change. (b) Meat concession known as Farmer Frank, purchased on December 30, 1957, and operated as a sole proprietorship in Pennsauken, N.J., until March 13, 1958, when he sold this business to Robert Rubin and took from Rubin a chattel mortgage of $25,000, with interest at 7 1/2 percent per annum, payable in 50 successive weekly payments of $537.50. These payments when received by petitioner were deposited in the Broad Street Trust Co. bank, but no credit appears for such deposits in the subtractions on Exhibit F. (c) By agreement dated May 6, 1958, petitioner agreed to purchase from Morris Sklar a certain meat concession for *142 $14,500. He made a 10 percent deposit of $1,450. The transaction was never completed and the $1,450 was refunded to petitioner. Petitioner deposited the refund in the Frankford Trust Co. on May 26, 1958 (included in the $26,568.37 of the Summary), and respondent has included it in the so-called "additional other income" of $27,913.95 for 1959. (d) In May 1958 petitioner purchased a retail meat business known as Amports Meat Market which he operated as a sole proprietorship in Philadelphia, Pa., through 1959. He reported total receipts from this business in 1958 of $312,788.02 and $248,805.38 in 1959. (e) About the middle of 1959 petitioner, as a sole proprietor, started a supermarket known as Martin's Thriftway, in Philadelphia, Pa., which he operated for the remainder of 1959, and reported total receipts from the business of $171,262.53. Globe Consumer Discount Co., hereinafter sometimes referred to as Globe, and Merchants Consumer Discount Co., Inc., hereinafter sometimes referred to as Merchants, are loan companies licensed under the laws of the Commonwealth of Pennsylvania. During the period 1957 through 1959 petitioner borrowed, in eleven different transactions, approximately *143 $42,365 from these companies. He would deposit the amount borrowed in one of the banks shown in the respondent's analysis of bank deposits previously mentioned herein. While including the loan in the deposits, the respondent, in his analysis, in determining the so-called "additional other income," subtracted all the loans, except one, from the deposits. The one exception was a loan dated March 30, 1959, of $5,000 which represented money petitioner borrowed from Merchants on March 30, 1959. On the same date petitioner deposited the $5,000 in the Broad Street Trust Co. bank. It represented a part of the deposits of $34,882.40 shown in respondent's analysis of bank deposits. The respondent failed to subtract this loan from the deposits shown in his analysis and by failing to do so, it became a part of what respondent in his analysis called "additional other income" of $27,913.95 for 1959. The partnership income tax return filed by petitioner and Burt for the year 1957 was audited by the respondent. A so-called "no change report" was issued indicating that the respondent proposed no adjustments with respect to the taxable income from this business as reported by petitioner and Burt. *144 Petitioners properly reported petitioner's share of the income from this partnership on their 1957 joint return in the amount of $4,049.22. Respondent has not proposed any adjustments with respect to the joint return filed by the petitioners for the year 1958. On December 10, 1958, petitioner purchased some shares of stock of the First Central Corporation for $3,000. The purchase price was paid by means of a check drawn on the Amports bank account. This stock was sold on July 1, 1959, for $3,925.36. The $925.36 gain was properly reported by the petitioners in their 1959 joint return. On December 9, 1959, petitioner transferred $1,000 from Amports to Martin's Thriftway to be used as change. This had the effect of increasing the deposits made by Martin's Thriftway in the Frankford Trust Co. (one of the "other banks" mentioned in the Summary) bank account by $1,000 and explains in part the respondent's inclusion of $9,065.94 (included in the $21,835.94 of the Summary) as "Unidentified Deposits (Thriftway)" in petitioners' income for 1959. In addition to this $1,000, petitioner withdrew during 1959 from the Frankford Trust Co. a total amount of $16,450 to be used as change. Petitioner *145 had for many years engaged in a weekly Monday night poker game. These weekly games were held throughout the years 1957 through 1959. The participants in these games were seven or eight men who had been friendly with each other since boyhood days. These participants were all business men or employees with substantial jobs. The games were conducted in the homes of the various participants and refreshments were served. On the average, a participant would either lose or win approximately $100 in an evening. A winner one evening might very well be a loser the next evening. Each of the participants provided stakes for himself either by bringing some cash with him or by cashing checks at the game or by actually using a check as his share of the stake in a particular pot. The participants, all being long-time friends, often lent each other various sums of money during the game. Such loans would be settled at the end of an evening or within a few weeks. This was a matter of reciprocal accommodation and no interest was ever charged. Thus, in the course of an evening, an individual may have written several checks or may have received several checks either by having won them in the pot or having *146 cashed them for another friend at the game. Petitioner usually deposited a part or all of any winnings he may have won and the repayments of any loans he had made to the other players within a day or two after each game. In 1957 and 1959 petitioner realized unreported net winnings of not more than $1,200 in each year from these weekly games. During the period here in question petitioner withdrew at least $3,464 from the various banks which he loaned to his cardplaying friends. In applying the bank deposit and cash expenditures method respondent gave no credit for amounts deposited by petitioner which represented redeposits of moneys withdrawn for the purpose of providing stakes at the card games, deposits of winnings which were offset by losses in the same year, and deposits of repayments of short-term loans made by petitioner to other participants in the game. Respondent determined that not only deposits represented sources of income, but further treated as income the arbitrary figure of $4,000 per year which was assumed to be personal cash expenditures. Mark Charleston is an attorney engaged in the private practice of law in Philadelphia, Pa. In addition, at the time *147 of the hearing he was general counsel to the Pennsylvania Department of Revenue. Charleston and petitioner have been friends for many years. Charleston was one of the participants in the card games described above. Charleston was petitioner's attorney. Legal fees were paid by petitioner out of his various business bank accounts. Charleston was in the habit of borrowing small amounts from petitioner which he always repaid. Until the latter part of 1958, Charleston had borrowed in this manner approximately $2,983. In the latter part of September 1958, Charleston borrowed from petitioner an amount of $10,000. This loan was repaid by Charleston at the rate of $100 per week, commencing in the beginning of October 1958. Charleston made payments to Goldfield by check each week during the last three months of 1958 (12 weeks) and throughout 1959. Petitioner deposited these $100 weekly checks in his bank account at the Broad Street Trust Co. In his analysis of bank deposits respondent gave petitioner credit for loan repayments by Charleston (included in the "Subtractions" mentioned in the Summary) of only $1,000 in 1958 and $500 in 1959. Facts as to Issue 3 As indicated above, during *148 the latter part of 1959 petitioner simultaneously operated both the Amports and Martin's Thriftway businesses. Certain business expenses attributable to the Thriftway business were paid out of the Amports bank account. Through error, four of these expenditures made in 1959 were not taken into account in computing the taxable income (or loss) from either the Thriftway or the Amports businesses. Thus, the petitioners have never received a tax deduction for the following expenditures: (1) Check No. 1366, dated August 5,
1959, payable to A. Handel, in the
amount of $350 for the purchase of a
cash register. The depreciation allow-
able in 1959 with respect to this capital
item is
$ 14.55
(2) Check No. 1050, payable to the
A & P Tea Co. for the sublease of the
premises in which the Thriftway store
was to be opened. Petitioner wished
to get into the premises a month prior
to the beginning of his lease in order
to renovate. Therefore, he sublet the
premises from the A & P Tea Co. dur-
ing the last month of their lease
1,050.00
(3) Check No. 1851, dated December
8, 1958, payable to Martin Kravitz.
Kravitz owned the produce concession
in the Thriftway market. All sales for
the entire market were rung up at the
cash registers at the front of the store.
Produce sales were separately shown.
At the end of the week the amounts of
produce sales indicated on the register
were paid over by check to Kravitz.
All amounts rung up on the register
were treated by petitioner's account as
sales. The amounts turned over to
Kravitz were an offset to sales and
thus reduced income
1,042.94
(4) Check No. 1531, dated September
9, 1959, payable to Harry Young for
trash collection
30.00
Total
$2,137.49
*149 Opinion The three issues presented for our decision are all factual and are controlled by the evidence of record consisting of a joint stipulation of facts with accompanying exhibits, the testimony of various witnesses, and approximately 45 documentary exhibits, including Exhibit F, supra, and an exhibit (Exhibit G) consisting of the cancelled checks for the 11 loans made to petitioner by the Globe and Merchants companies. On the first issue, petitioner has accepted the respondent's determination that his basis of the partnership interest was $2,128.54 instead of $7,837.50 used by petitioner in his return. He also concedes that the selling price of the partnership interest was $25,000 instead of $20,000. He points out, however, that he erred in reporting the sale partly as a sale of a capital asset held for more than six months and partly as a sale of property other than a capital asset. We agree with petitioners that under section 741, I.R.C. 1954, [2] the amount received upon the sale of a partnership interest held for more than six months is to be taxed as capital gain. Accordingly, the total amount of $25,000 received upon the sale of the partnership *150 interest, less the $2,128.54 basis and the $750 legal fees, is to be treated as long-term capital gain. Respondent contends for the first time in his *151 brief that "Because petitioners have not proved the essential of what the liabilities of the partnership were, no computation can be made which affects respondent's determination that petitioners had a long-term capital gain in 1957 in at least the amount of $2,854.48." There is no merit in respondent's contention. Respondent did not recognize any liabilities in his determination. His present contention raises a new issue for the first time in his brief and comes too late. Louis Wellhouse, Jr., 3 T.C. 363, 371; Sheldon Tauber, 24 T.C. 179, 185; and Merle P. Brooks, 36 T.C. 1128, 1133. Furthermore, $25,000 was all petitioner was to receive or did receive for his partnership interest. The correct computation of his gain is set out in our findings of fact. We so hold. Regarding the second issue, the respondent determined that petitioners had "Other income" in 1957 and 1959 of $10,514.90 and $27,913.95, respectively. He arrived at these amounts by means of an extremely complicated and inadequately explained "Analysis of Bank Deposits and Cash Expenditures," which analysis we have summarized in our findings. In this analysis the respondent took *152 into consideration the bank deposits and cash expenditures for the year 1958 although no deficiency was determined for 1958 and we have no jurisdiction over 1958. Cf. General Baking Company, 48 T.C. 201, Footnote 1 (filed May 23, 1967). Petitioners have shown that during the years 1957 through 1959 they received income from (1) wages earned by Bernice Goldfield in 1957, (2) the various businesses owned by petitioner as described in our findings, (3) interest income, and (4) capital gain from the sale of the First Central Corporation stock. The income from all of these sources was either reported on the joint returns as filed or the subject of respondent's adjustments, all of which have been agreed to. The only other possible source of income as shown by the record is the weekly poker games that petitioner engaged in with his friends. He reported no income from this source, it being his contention that he generally lost as much as he won and that therefore he had no net winnings. We have carefully weighed all the evidence on this point and have found as an ultimate fact that petitioner realized in 1957 and 1959 unreported net winnings of not more than $1,200 in each *153 year from these weekly games. Cf. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). These amounts of $1,200 should be added to petitioners' taxable income for 1957 and 1959 in place of the amounts of $10,514.90 and $27,913.95, respectively. The bank deposit method of determining income has been approved in some cases. A good example is Drinkhouse v. Commissioner, 225 F. 2d 874 (C.A. 2, 1955), affirming a Memorandum Opinion of this Court. Even in that case the Second Circuit Court of Appeals said: Concededly, proof of bank deposits, standing alone, does not establish the receipt of income. But many other circumstances may create the same inference. * * * The "other circumstances" in this case are all favorable to petitioners. In our opinion, with the exception possibly of additional income from poker, petitioners have clearly demonstrated that the determination of additional income under the bank deposits method was excessive and arbitrary. Several nontaxable sources of deposits, in addition to those shown by the respondent in his analysis, have been proven beyond any possible question. Specific examples are the failure of respondent to give petitioner *154 credit for a loan in the amount of $5,000; failure to give petitioner credit for the repayment of the loans to Charleston; [3] failure of respondent to recognize that petitioner lost at poker as well as won and that the deposit of his winnings was not all income; the erroneous inclusion by respondent of a deposit in Frankford Trust Co. on May 26, 1958, of $1,450 when this was merely a return to petitioner of a deposit made by petitioner on a deal that did not materialize; and the erroneous inclusion by respondent of amounts transferred from one business to another to be used as change. Furthermore, the additions by respondent on his analysis, set out in our findings, of certain items such as "Repaid Loan (Globe by cash 12/16/57)" in the amount of $1,500, "* * * (1) Analysis 12/31/59 (Unidentified Deposits (Thriftway)" [4] in the amount of $9,065.94; "* * * (3) Purchase of Equipment (J & E #1)" [5] in the amount of $8,000; and "Personal Cash Expenditures" in the amount of $4,000 for each of the years 1957, 1958, and 1959 are all ambiguous on their face. *155 We do not think the respondent's analysis of bank deposits in this case clearly reflects income. Cf. section 446, I.R.C. 1954. All of petitioners' returns were professionally prepared by a certified public accountant. With the exception of Issues 1 and 2 herein, the respondent has accepted those returns as correct, except for some minor adjustments, all of which have been agreed to by petitioners. The only source of income other than as shown on the returns would be the poker winnings which we have already discussed. We think the petitioners have overcome the presumption of correctness of the respondent's determination as to this issue except for the additional unreported income from poker. Cf. Helvering v. Taylor, 293 U.S. 507; Cullers v. Commissioner, 237 F. 2d 611, 614 (C.A. 8, 1956), reversing and remanding a Memorandum Opinion of this Court; and Harp v. Commissioner, 263 F. 2d 139 (C.A. 6, 1959), reversing in part and remanding a Memorandum Opinion of this Court. In the latter case the Court of Appeals said: In short, the Commissioner's determination is presumed correct, but if error is shown, the presumption *156 disappears and the Commissioner then has the burden of proving the correctness of his determination, or at least the correct amount actually due. A presumption is but a heavier burden of proof, but once overcome the burden of going forward shifts with the introduction of the proofs. The respondent, aside from the stipulation of facts with the accompanying exhibits, offered no evidence other than his cross-examination of petitioners' witnesses, the analysis of bank deposits summarized in our findings, and Exhibits G and H. [6]
On this issue, we hold that in 1957 and 1959 petitioner realized unreported income of not more than a net of $1,200 in each year from his weekly poker games. The third issue involves some ordinary and necessary business expenses that were completely overlooked by petitioner's certified public accountant at the time he prepared petitioners' joint return for 1959. During the year 1959 petitioner owned as a sole proprietor a business known as Amports Meat Market. Toward the end of 1959 he established *157 in a building located next door to Amports a supermarket known as Martin's Thriftway. This Thriftway operation was also owned by petitioner as a sole proprietor. During the period of time that both businesses were being established and simultaneously operated, petitioner paid certain expenses properly attributable to the Thriftway operation out of Amports' bank account. These expenditures were not treated as business expenses for the purposes of determining the taxable income attributable to either Amports or Thriftway. They were completely overlooked by Tanenbaum. These expenditures are set forth in detail in our findings of fact and amount to a total of $2,137.49. We hold petitioner is entitled to an additional deduction in 1959 for this amount. Decisions will be entered under Rule 50. Footnotes
1. In their first amended petition in docket No. 995-62, petitioners now concede that the depreciated cost basis of the partnership interest was $2,128.54 as determined by respondent but allege that the proof shows the total purchase and selling price of the partnership interest was $25,000 instead of $20,000, and that the entire transaction should have been treated as a purchase and sale of a capital asset held for more than 6 months.↩
*. Incorrectly shown by respondent as $50,991.63.↩
*. Incorrectly shown by respondent as $1,959.00.↩
2. Sections 741 and 751 of the 1954 Code provide: SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE. In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value). SEC. 751. UNREALIZED RECEIVABLES AND INVENTORY ITEMS. (a) Sale or Exchange of Interest in Partnership. - The amount of any money, or the fair market value of any property, received by a transferor partner in exchange for all or a part of his interest in the partnership attributable to - (1) unrealized receivables of the partnership, or (2) inventory items of the partnership which have appreciated substantially in value, shall be considered as an amount realized from the sale or exchange of property other than a capital asset.↩
3. The analysis shows that respondent did give petitioner credit of $1,000 in 1958 and $500 in 1959 but Charleston repaid in those years at least the amount of $9,383. ↩
4. In his footnote (1) of the Analysis, respondent uses sales for cash only of $156,273.83, whereas the total receipts reported by Martin's Thriftway for 1959 was $171,262.53. ↩
5. A purchase of property does not constitute income.↩
6. Exhibit H is a copy of the check Burt gave petitioner on December 17, 1957, for $20,000 as part payment for petitioner's one-half interest in the partnership.↩