Joseph W. Monahan, Jr. v. Commissioner. Joseph W. Monahan, Jr. and Anne M. Monahan v. Commissioner.
Monahan v. Commissioner
Docket Nos. 4647-66, 4648-66.
United States Tax Court
T.C. Memo 1968-234; 1968 Tax Ct. Memo LEXIS 65; 27 T.C.M. (CCH) 1157; T.C.M. (RIA) 68234; October 9, 1968. Filed Arthur Gottlieb, 31 Milk, Boston, Mass., for the petitioners. Lawrence A. Wright and Joel Gerber, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in and additions to income tax in these consolidated proceedings as follows: *10 Joseph W. Monahan, Jr. *10 Docket No. 4647-66 *10
Additions to the Tax, *10
I.R.C. 1954
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a)
1957
$ 3,480.02
$ 1,740.01
$97.43
1958
4,061.55
2,030.77
1961
48,528.36
24,372.18
*66 *10 Joseph W. Monahan, Jr. *10 and Anne M. Monahan *10 Docket No. 4648-66
Additions to the Tax, I.R.C. 1954
Year
Deficiency
Sec. 6653(b)
1959
$22,110.64
$11,063.88
1960
42,086.63
21,043.31
The petitioners dispute the Commissioner's determination of deficiencies in their entire amount for each of the above years. Also disputed is the addition to the tax under section 6654(a) and the Commissioner's determination that part of the underpayment for each year was due to fraud under section 6653(b), [1] I.R.C. 1954. [2]
Findings of Fact Some of the facts have been stipulated and are so found. Joseph W. Monahan, Jr. (hereinafter sometimes referred to as Monahan *67 or petitioner) and Anne M. Monahan, the petitioners herein, are husband and wife and were residents of Massachusetts during the years 1957 through 1961, and at the time of the filing of the petitions in this case were residents of Nashua, New Hampshire. Joseph W. Monahan, Jr. filed his individual Federal income tax return for the taxable years 1958 and 1961 with the district director of internal revenue, Boston, 1158 Massachusetts. The Monahans filed their joint Federal income tax return for the taxable years 1959 and 1960 with the district director of internal revenue, Boston, Massachusetts. With respect to the years 1958 through 1961, consents were properly executed extending the statute of limitations on assessment. The petitioners did not file any return, and they did not pay any estimated income tax, for 1957. The Monahans used a cash-basis, calendar-year method of reporting for Federal income tax purposes, and for each of the taxable years in question were entitled to personal exemptions totaling $4,800 for themselves and their six children. Anne M. Monahan is a party to this action only by virtue of her having signed joint returns for the years 1959 and 1960. *68 Joseph W. Monahan, Jr. is an individual who was, during the taxable years 1957 through 1961, the president and 50 percent stockholder of the Joseph W. Monahan, Jr. Insurance Agency, Inc. (hereinafter sometimes referred to as the Agency), in Boston, Massachusetts. The Agency conducted a casualty insurance business. Monahan was office and sales manager. During these years he was also self-employed as an insurance and real estate broker, operating separately from the Agency. He was also in partnership with Kyrn Bulger in this business. As the result of a substantial embezzlement loss, the Agency was heavily in debt during 1957 and owed large amounts on insurance premiums to various insurance companies. Monahan's father assisted the Agency in securing loans to meet these obligations by pledging various securities as collateral. At this time, George P. Lordan (hereinafter sometimes referred to as Lordan), an old friend of the father, was named treasurer of the Agency and was given exclusive authority to sign the corporate checks. Pursuant to arrangements made in connection with his father's giving of collateral for the business, Monahan agreed to work without salary. The Agency was *69 to pay his expenses, however. This arrangement continued in force throughout the years involved in this suit. During these years it was Monahan's practice to present Lordan with his bills, including bills from his garage for gasoline and repairs on two cars owned and used by him and his family; from his country club for such things as golf lessons, golf balls, and swimming lessons; from his dairy; telephone company; and from his bank for installment payments on his two cars. Lordan would pay these bills without ascertaining whether or not he was paying business expenses of the Agency or Monahan's personal expenses. Monahan used his cars in his business as an insurance salesman. They also were used by him and his family for nonbusiness purposes. Monahan, during all these years, was being supported to a substantial degree by his father who provided his family with a house in which to live rent-free. His father also helped with the groceries for the large family and frequently helped him pay his automobile expenses, country club dues, and charges. Thirty percent of the Agency checks for car maintenance are attributable to Monahan's business use of the cars. Besides the above-mentioned *70 checks, Lordan also wrote checks to "cash," "Monahan Ins. Agency," or "Joseph W. Monahan, Jr." These checks were often for substantial amounts. There were checks to various individual payees which were charged to Monahan's account on the corporate records. None of these were used to pay business expenses. The Commissioner employed the specific item method in order to reconstruct Monahan's income for the years 1957 and 1958. Specific commissions were located and the Agency checks discussed above were included to determine income from these two sources as follows: Taxable Year
CommissionsIncome
Selected AgencyPayments
1967
$ 3,250.00
$14,236.10
1958
16,163.98
3,256.31
Specific items of income for the years 1959, 1960 and 1961 have been identified by the Commissioner in the form of commissions and Agency check payments as follows: Taxable Year
CommissionsIncome
Selected AgencyPayments
1959
$ 8,017.92
$ 4,891.70
1960
20,197.60
14,869.96
1961
16,294.12
7,503.70
In addition to these items of income the Commissioner determined specific items of 1159 unreported income and disallowed claimed deductions as follows: 1958 *71 - The Commissioner disallowed "other business deductions" of $3,977.20 and interest expense of $625.45. 1959 - The Commissioner determined a short-term capital gain of $1,185.49 and a short-term capital loss of $42.20, respectively, from the sale of securities of Stop and Shop and J.W. Hancock. He disallowed long-term capital loss from the sale of securities of Golden West Markets of $4,577.76, "other business deductions" of $3,784.69, interest expense of $471.26, and medical expenses of $1,877.97. 1960 - The Commissioner determined additional income from Francis W. Kiernan of $945, unreported net short-term gain from the sale of capital assets of $2,535.32, and increased interest income in the amount of $276. He disallowed "other business deductions" of $5,266.70, and medical expenses of $1,666.43. 1961 - The Commissioner determined gain from the sale of capital assets of $2,538.31, disallowed "other business deductions" of $6,012.93, and disallowed interest expense of $2,264.45. By the bank deposits and expenditures method, the Commissioner determined additional income from undisclosed sources of $38,947.85, $53,218.32, and $63,628.31, respectively, for the years 1959 through *72 1961. During these years Monahan kept accounts at several banks. An analysis of these banks' records showed the following deposits consisting of numerous items: Taxable Year
Checks
Cash
Total
1959
$ 84,671.36
$ 99,150.99
$183,822.35
1960
119,881.60
104,166.42
224,048.02
1961
88,887.46
134,506.96
223,394.42
The Commissioner made eliminations of deposits which were determined to represent proceeds from security transactions and deposits from non-income sources, including a check-kiting scheme [3] Monahan was engaged in throughout these years. As a result of this scheme, there were numerous check transfers between accounts and non-income deposits *73 representing money borrowed from friends to cover overdrafts. The Commissioner's agents adopted a method for eliminating these non-income deposits. Knowing that individuals were helping Monahan cover overdrafts at particular banks, a complete analysis of all checks drawn on Monahan's account to these individuals was made. A determination was made as to when a particular check was cashed. Then the agent compared the current cash deposits to the drawee banks on that day; if there was an unaccounted for deposit the agent made an elimination up to the amount of the checks written to these particular individuals. By this method we find the Commissioner's agents substantially eliminated all nonincome deposits that resulted from this scheme. The following eliminations were made by the Commissioner: *10 Eliminations - Non-income Deposits
Taxable Year
Checks
Cash
Total
1959
$83,622.83
$59,080.82
$142,703.65
1960
96,739.02
59,091.77
155,830.79
1961
79,736.81
69,442.30
149,179.11
Thus, the following deposits were determined to constitute additional income to petitioner: *10 Deposits Not Eliminated
Taxable Year
Checks
Cash
Total
1959
$ 1,048.53
$40,070.17
$41,118.70
1960
23,142.58
45,074.65
68,217.23
1961
9,150.65
65,064.66
74,215.31
*74 Then, by subtracting income deposits the source of which he was able to identify from total deposits considered ordinary income, the Commissioner was left with income deposits the source of which were not identified in the amounts of $38,947.85, $53,218.32 and $63,628.31, respectively, for the years 1959, 1960 and 1961. The Commissioner determined total ordinary income for these years by adding to the deposits considered to be ordinary income the specific items of income that had not been deposited: Taxable Year
DepositsConsideredto be OrdinaryIncome
OrdinaryIncome Item s NotDeposited
Total orOrdinaryIncome Received
1959
$41,118.70
$12,156.27
$53,274.97
1960
68,217.23
25,013.65
93,230.88
1961
74,215.31
15,710.82
89,926.13 1160 Monahan was convicted with Francis W. Kiernan on indictments charging them with larceny and conspiracy to commit larceny from the Massachusetts Parking Authority. [4] That theft constitutes a possible source of income for the years 1959 through 1961. Monahan did not maintain individually any adequate records during any of the *75 years involved in this suit. He obtained Forms 1099 from only some of the insurance companies from which he received commissions. Where these forms were obtained the amount shown on them was the amount reported as income on his tax returns. There are numerous instances of Monahan's overstating on his returns his commissions from some sources from which he had not obtained Forms 1099. Over the whole period, however, Monahan's total commissions income was understated by $18,794.40. As to particular years, some of the discrepancies between Monahan's reported commissions income from specific sources and the amounts determined by the Commissioner to be his actual commissions appear to be explained by their respective allocations of certain income items into different taxable years, or a variance between amounts shown on Forms 1099 and the Commissioner's determination of actual commissions. The following schedule compares the Commissioner's determination of Monahan's taxable income [5] with his reported taxable income: TaxableYear
Taxable Incomeor (Loss)Reported
CorrectedTaxable Income
1957
None
$12,186. 10
1958
($ 233.67)
13,642.74
1959
( 4,556.39)
53,056.85
1960
( 3,135.53)
84,090.77
1961
( 1,198.84)
79,383.71
*76 Ultimate Findings of Fact The Commissioner's determinations of income and his disallowance of claimed deductions for all years are correct, except that 30 percent of the Agency payments for the maintenance of Monahan's cars does not constitute taxable income to the petitioner. Monahan, in each of the years in question, underpaid his taxes with the intent to defraud the Government, and the Commissioner correctly determined the additions to the taxes under section 6653(b). Monahan did not file a return or pay an estimated income tax for 1957, and the Commissioner correctly determined the addition to tax under section 6654(a). Opinion We must first decide whether Monahan owes taxes for the years 1957 through 1961, and, if so, in what amounts. We will then have left the question whether Monahan's failure to pay these amounts, if any, was due to fraud with the intent to evade taxes. I Because no tax return for 1957 was filed, the statute of limitations is no defense to the assessment for that year. Section 6501(c)(3), I.R.C. 1954. *77 We have set out in our findings of fact the Commissioner's determinations of income and his disallowance of deductions with respect to each year that is involved in this suit. These determinations fall basically into four separate groups according to the defenses raised by Monahan. The groups are: (1) commissions income for all years; (2) selected Agency payments for all years; (3) other income determined by the Commissioner and his disallowance of claimed deductions for all years: and (4) the additional income from undisclosed sources for 1959 through 1961 that was determined by the bank deposits and expenditures method. There is no overlapping between the various groups. We will discuss them separately in that order. A presumption of correctness attaches to the Commissioner's determination. Rule 32, Tax Court Rules of Practice. In proceedings before the Tax Court, it is sufficient to overcome this presumption that the taxpayer prove the determination is incorrect. Harp v. Commissioner, 263 F. 2d 139 (C.A. 6, 1959). Or the taxpayer may show that the Commissioner's determination is arbitrary and excessive. In either circumstance the Commissioner would then have the *78 burden of proving the correctness of his determination, or at least the correct amount actually due; the taxpayer would not be required to establish the correct amount that lawfully might be charged against him, nor would he be required to pay a tax that he did not owe. Harp v. Commissioner, supra; Durkee v. Commissioner, 162 F. 2d 1161 184, 187 (C.A. 6, 1947). The petitioner alleges he has shown the determination with respect to commissions to be incorrect, because the Commissioner did not make proper allowance for the share in these commissions of his partner, Kyrn Bulger. We do not find Kyrn Bulger had any interest in these commissions or that he ever, in fact, received any of them. The only thing Monahan has shown is the existence of the partnership. That does not amount to a showing that these items were partnership income. He has not shown any error here. The second group of income items is the selected Agency payments for each year. Monahan argues that in light of the arrangements he made with his father, it is unthinkable he would have drawn funds from the corporation in violation of the agreement that only his car and business expenses should be borne by *79 the corporation. We find he did. He argues further that the corporation was insolvent during these years and that there was no surplus against which distributions could be charged as dividends. He has produced no evidence of such insolvency. In any event, a corporation need not have surplus out of which to pay salaries or other compensation to its employees. With respect to this group of items, we find the presumption of correctness overcome only with respect to the automobile expenses. These expenses were of a type prevalent in Monahan's business as an insurance salesman. The Cohan rule of approximation ( Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930)) applies to these years; we find 30 percent of the Agency's check payments for his automobile expenses to constitute ordinary and necessary business expenses of the Agency. As to all the other check payments, we do not find error by the Commissioner. The third group is other income determined by the Commissioner and his disallowance of deductions for such things as capital losses, other business expenses, interest expenses, medical expenses, etc. With respect to all items in this group, Monahan has failed to offer *80 any evidence of error in the determinations of the additional income; he has not shown he is entitled to any of the claimed deductions. The Commissioner's determination must be sustained as to all these items. See Welch v. Helvering, 290 U.S. 111 (1933); Rule 32, Tax Court Rules of Practice.
The last group is additional amounts of income from undisclosed sources of $38,947.85, $53,218.32, and $63,628.31, respectively, for the years 1959 through 1961. These were determined by the bank deposits and expenditures analysis method. Monahan attacks the propriety of this method of computing income in this particular case. He argues, too, the Commissioner has not made eliminations of all non-income deposits. Last, he argues there is no undisclosed source of income from which he could have received income in these large amounts. The bank deposits and cash expenditures method is one of the long accepted methods of reconstructing income where, as here, the taxpayer's method of accounting on his books and records do not clearly reflect income. Gleckman v. United States, 80 F. 2d 394 (C.A. 8, 1935), certiorari denied 297 U.S. 709, and the cases cited *81 therein. The bank deposits theory is based upon the assumption that, under certain circumstances, proof of deposits which are unexplained is proof of taxable income. These circumstances are: (1) the existence of a business or calling of a lucrative nature, and (2) the taxpayer's deposit of funds to his own account and his checking against them for his own use. Gleckman v. United States, supra. These circumstances are present in this case. The same presumption of correctness that was discussed above applies here. Again Monahan argues he has successfully assaulted that presumption. He cites Martin Goldfield, 26 T.C.M. 575 (1967). In that case the taxpayer successfully discredited the bank deposits and expenditures method in determining the additional income by his specific showing that various items should have been omitted from income which the Commissioner had failed to credit. The Court found specific examples of amounts which the Commissioner determined to be income and which the taxpayer had proven were not income in fact. We have searched in vain here to find instances of the Commissioner's determination as income of deposits that petitioner has *82 proved to be from nontaxable sources. Petitioner argues these bank deposits included proceeds from the sale of stock and commissions earned and reported. But he cannot cite one instance where the 1162 Commissioner has mistakenly included such amount. It was by a showing of this kind that the taxpayer in Martin Goldfield, supra, prevailed. Petitioner also argues that the Commissioner's determination was arbitrary and excessive. We find that in light of the inadequacy of petitioner's records the selection of this method was reasonable and appropriate. The Commissioner has proved the deposits and has made eliminations of non-income deposits as fairly as the circumstances permitted. Use of the net worth method in this case would have been fruitless because of the impossibility of establishing a base value as a starting point. Petitioner suggests that there is no evidence of a possible source from which income could have been received in these amounts. We disagree. See Commonwealth v. Monahan, 349 Mass. 139, 207 N.E. 2d 29 (1965). The $162,000 figure representing income from unidentified sources does not seem to us at all out of line with the facts as they *83 are set out in that case. II We are left to decide whether the Commissioner has met his burden of proof to show fraud as to the specific years. He must show by clear and convincing evidence that Monahan knowingly failed to state his correct taxable income with the intent, at the time his returns were filed, to evade the tax in each of the years in issue. Estate of William Kahr, 48 T.C. 929, on appeal (C.A. 2, July 3, 1968) and (C.A. 5, July 3, 1968); Arlette Coat Co., 14 T.C. 751. Fraudulent intent is a state of mind seldom susceptible of direct proof. Its existence must be gleaned from the entire record. M. Rea Gano, 19 B.T.A. 518. Consistent and repeated understatement of income is evidence from which fraud may be inferred, but does not in and of itself meet the "clear and convincing" test. John Marinzulich, 31 T.C. 487. On the basis of the record before us, however, we are satisfied that such relatively large understatements of net income, the consistent understatements and omissions of income from numerous sources as are present here, could not have been due to mere inadvertence, carelessness or ignorance. We cite specifically *84 the failure to report specific items of income from commissions for each year, the failure to report income from the Agency, the failure to report gain from the sale of securities, and the claimed deductions for business expenses, interest expense, and medical expenses that have never been substantiated in the slightest degree. The claimed business deductions for such things as swimming lessons and golf balls are patently frivolous, and we are convinced that Monahan knew it when he filed his returns. We are convinced, too, that Monahan intentionally omitted from his returns for each year items of income from several sources and this was with the intent of evading taxes. The Commissioner has met his burden of proof that some part of the deficiency for each of the years 1957 through 1961 was due to fraud with the intent to evade tax. Decisions will be entered under Rule 50. Footnotes
1. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). ↩
2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.↩
3. The term "kiting" is used to describe a method of concealing a shortage in a bank account by depositing in it, and not recording in cash receipts or disbursements, a check drawn on another bank; the unrecorded check may later be covered by drawing another unrecorded check on a bank other than the one on which the first check was drawn. The time required for the checks to clear through the banks may conceal the shortage for some time. Lenhart & Defliese, Montgomery's Auditing 135 (8th Ed. 1957).↩
4. Commonwealth v. Monahan, 349 Mass. 139, 207 N.E. 2d 29↩ (1965).
5. No adjustment for the Cohan approximation for car expenses has been computed for purposes of this schedule.↩